ALBERT H. SHUMAN & others *vs.* BOARD OF ALDERMEN OF NEWTON & others.

Middlesex.    March 7, 1972. — May 8, 1972.

Present: TAURO, C.J., CUTTER, SPIEGEL, REARDON, & HENNESSEY, JJ.

*Zoning*, Board of aldermen: decision; Special permit; "Association of persons living together." *Evidence*, Relevancy and materiality. *Words*, "Association of persons."

The requirements of G. L. c. 40A, § 18, were satisfied, in substance, where the reasons for a board of aldermen's order granting a special permit were apparent from a supplemental statement, filed late but within a reasonable time and without prejudice to persons opposing the permit, from the text of a committee report adopted by the board, from the order itself, and from the conditions attached to the permit. [764–765]

The standards specified in a city's zoning ordinance authorizing the board of aldermen to grant special permits for certain uses, including "[a]ssociation of persons living together in a common dwelling . . . dormitory . . . educational institutions," and to grant exceptions to the district regulations "in harmony with their general intent and purpose" and "subject to . . . appropriate conditions and safeguards" were not fatally vague or uncertain [766]; within the terms of the ordinance, a group consisting of a minister and his wife who, pursuant to the purposes of benevolent organizations, lived with and supervised high school students who had difficulty living at home constituted an "[a]ssociation of persons living together in a common dwelling"; a single residence house in which the group lived could constitute a "dormitory"; and the benevolent organizations which brought about such arrangements were, in a general sense, an "educational" institution [766].

A special permit granted by the board of aldermen of a city under its zoning ordinance was validly made personal to the named permittee and only operative while that permittee occupied the designated premises and complied with conditions attached to the permit. [766–767]

Shuman *v*. Board of Aldermen of Newton.

In a suit in equity under G. L. c. 40A, § 21, by way of appeal from a decision of the board of aldermen of a city granting a special permit under its zoning ordinance, evidence concerning the applicant's educational activities was properly admitted as relevant to the appropriateness of its activities in a residential district [767]; and a supplemental statement indicating the reasons for the board's decision and a committee report adopted by the board were admissible as a "detailed record of . . . [the board's] proceedings" within § 18 [767–768].

In a suit in equity under G. L. c. 40A, § 21, by way of an appeal from a decision of the board of aldermen of a city granting a special permit under its zoning ordinance to operate, in a single residence area, a single residence dwelling for high school students alienated from their parents, the trial judge was justified in concluding that the permit was in the public interest and would not be detrimental to the residence or the neighborhood where it appeared that there was evidence of the need for, and the public usefulness of, the project and that the house would be improved yet remain as a single residence, despite testimony that market values would decline in the neighborhood. [768]

BILL IN EQUITY filed in the Superior Court on May 20, 1972.

The suit was heard by *Campbell, J.*

*Robert M. Bonin* (*Stephen M. Levinson* with him) for the plaintiffs.

*Frederick G. Fisher, Jr.*, for the defendants.

CUTTER, J. The owners (the neighbors) of land abutting upon or near 361 Commonwealth Avenue, Newton (the locus) appeal (G. L. c. 40A, § 21) from action of the board of aldermen (the board). The board, acting as the special permit authority under the Newton zoning ordinance (§ 25–26), granted a special permit to the trustees of Freeport Foundation, who are also named as defendants,[1] to operate on the locus (on which stands a large single family frame residence) a "dwelling for per-

---

[1] The trustee of Freeport Realty Trust (which took title to the locus on June 2, 1970) and Freeport, Inc., were joined as parties defendant upon the neighbors' motion. The judge found that Freeport Foundation was formed (with participation by the First Unitarian Society in Newton as donor of $250) "to . . . operate a 'home' for high school students . . . who . . . cannot live with their families, and to adopt such policies as will be 'preventive' in the sense that young people and sympathetic adults will attempt to provide an environment of cooperative living as a[n] . . . alternative to the . . . 'institutions' usually offered to young people who have become alienated from their families, and by offering . . . assistance to [such] alienated young people." Freeport, Inc., is a charitable corporation incorporated under G. L.

sons of high school age . . . who are alienated from living with their parents." A Superior Court judge made careful and perceptive findings. These were adopted by him as a report of material facts. A final decree was ·entered sustaining the action of the board. The evidence is reported. Except as otherwise indicated, the facts are stated on the basis of the report of material facts.

The locus and the neighbors' lots and houses are in a Single Residence B zone. The area is a "fine, single family neighborhood" with houses with a market value of $60,000 to $80,000. There are no commercial or business uses in the neighborhood. Section 25-5 permits, as of right, in single residence districts, dwellings for not more than one family, churches, and schools not operated for profit (but not including nursery or reform schools or dormitories). Accessory uses shall be permitted if "not injurious to the neighborhood." In addition, the board may permit one or more of certain additional uses, some of which are listed in the margin.[2] Action of the board must be in accordance with § 25-26 [3] of the ordinance.

---

c. 180, with purposes similar to those of Freeport Foundation, although worded more broadly to include "educational opportunities" to high school students and courses of study for the general public regarding problems of high school students and adolescents. After the permit was voted the trustee of Freeport Realty Trust conveyed the locus to Freeport, Inc. The judge found that, for most of the material issues, "Freeport Foundation and Freeport, Inc., may be treated as identical . . . [with] essentially similar purposes and . . . controlled by essentially the same persons." The word "Freeport" in this opinion, unless otherwise indicated, refers to either or both entities without distinction.

[2] Uses allowable (§ 25-5 [b]) by the board by permit include: "(1) *Association of persons living together in a common dwelling.* (2) Hospital, sanitarium . . . or rest home or other like institution. (3) Nursery school, trade . . . or vocational school, *dormitory,* library, museum *or other* literary or *educational institutions.* . . . (5) Public or private dump . . . . (6) Farm . . . truck garden . . . . (7) The removal of sod . . . or gravel . . . for the purposes of . . . sale . . . . (8) Private garage with provision for more than three automobiles. (9) Chapel . . . on . . . [cemetery] grounds . . . . (10) Radio or television transmission station. (11) . . . [A]ccessory purposes [to the foregoing] . . . not injurious to a neighborhood . . . for single-family residences . . ." (emphasis supplied).

[3] The pertinent portions of § 25-26 read: "(a) When in its judgment the public convenience and welfare will be substantially served, the board of aldermen may, on petition, and subject to such ap-

Statutory authority to issue special permits is given by G. L. c. 40A, § 4.[4] Freeport's application for a permit was filed on February 2, 1970, and set out the proposed use of this ten bedroom house as a residence for not more than sixteen students (to be charged only actual cost of room and board) under the supervision of an adult couple. The application was referred to the board's

---

propriate conditions and safeguards as it may impose, which may include provisions for yearly renewals and revocation at the pleasure of the board . . . allow exceptions to the application of the district regulations . . . in harmony with their general intent and purpose, to: . . . (2) Permit certain uses of buildings or land in single residence districts. . . . (b) Persons desiring to obtain the permission of the board of aldermen for any purpose for which permission is required under this chapter . . . shall make application therefor in writing to the board. The board . . . or a committee thereof, within a reasonable time shall hold a public hearing . . . shall require the applicant to file such . . . information as it may deem necessary, and shall give public notice of the hearing as required by G. L. c. 40A, § 17, as at the time in effect. "The board . . . may attach such conditions and limitations of time to a permission granted under this section as may be necessary to protect the neighborhood . . . . (c) The permission of the board of aldermen . . . shall be granted only by two-thirds vote of all the board of aldermen . . . ."

[4] *Section 4* (as amended through St. 1966, c. 199) reads, "A zoning ordinance . . . may provide that exceptions may be allowed to the regulations and restrictions contained therein, which shall be applicable to all of the districts of a particular class and of a character set forth in such ordinance . . . . Such exceptions shall be in harmony with the general purpose and intent of the ordinance . . . and may be subject to general or specific rules therein contained. The board of appeals established under . . . [§ 14] of such city . . . or the city council of such city . . . as such ordinance . . . may provide, may, in appropriate cases and subject to appropriate conditions and safeguards, grant to an applicant a special permit to make use of his land or to . . . maintain buildings . . . thereon in accordance with such an exception. Before granting such a special permit the board of appeals, or the city council . . . whichever the ordinance . . . provides, shall hold a public hearing thereon, notice of which shall be given in accordance with [§ 17] . . . . [I]f a city council . . . [is] designated to act upon such a special permit, they shall be subject to the requirements of . . . [§§ 18, 19, 20, and 21] in the same manner as the board of appeals." Section 4 also provides that a city council of more than five members (which is the case of the Newton aldermen), may hold the public hearing before a committee and that a vote to grant a special permit requires a two-thirds vote of all members of the council. *Section 18* (as amended through St. 1969, c. 870, § 1; see later amendments by St. 1970, c. 271, and St. 1971, c. 1018) provides (in part): "The decision of the board shall be made within sixty days after . . . the filing of an . . . application . . . . The board shall cause to be made a detailed record of its proceedings showing the vote of each member upon each question . . . and setting forth clearly, the reason or reasons for its decisions, and of its other official actions . . . ." These papers are to be filed in the office of the city clerk.

Land Use Committee, which held a well attended public hearing on April 13, 1970. There was compliance with all requirements of notice and newspaper publication.

The Committee on April 16 met and voted (either six to one or five to two) to recommend to the full board that the permit be granted subject to conditions, obviously drafted with great care " in an effort to protect the neighborhood." These were supplemented by additional safety restrictions on April 23.[5]

The full board (of aldermen) met on May 4, 1970. The meeting was open to the public. The chairman of the Land Use Committee read to the full board the committee's report (contained in a previously prepared typed memorandum describing the Land Use Committee's views). The report recommended that the permit be granted, subject to listed conditions. The board voted (two members absent and one vacancy), eighteen to three, to adopt the report by an order (drafted by the city's planning department) set out in part in the margin.[6] The conditions form part of the order and some of these also are set out in the margin.[7] The filed copy

_____

[5] About April 13, 1970, the Newton planning board voted to disapprove the permit application. Its unfavorable report was made known to the board at the meeting on May 4, 1970.

[6] "CITY OF NEWTON – IN BOARD OF ALDERMEN MAY 4, 1970, Ordered: That the Board finding that the public convenience and welfare will be substantially served by its action and that said action will be without substantial detriment to the public good, and without substantially derogating from the intent or purpose of the zoning ordinance, the following permissive use is hereby granted: . . . Freeport Foundation, Location: 361 Commonwealth Avenue, Ward 6 — to be used for: A dwelling for persons of high school age with the written permission of their parents who are alienated from living with their parents, under the supervision of 1 or more adults. Construction: Wood frame . . . ."

[7] The order was approved subject to the following conditions (among others) : "4. No resident student . . . shall keep either an automobile or a motorcycle . . . . 5. There shall be no more than nine (9) resident students . . . at any one time. 6. All resident students shall be of the same sex; and shall be attending . . . high school in . . . Newton. . . . 8. The possession [or presence] . . . at . . . [the] premises of any illegal narcotic drug . . . shall be a violation of this permissive use. . . . 10. . . . . This permissive use shall only be valid as long as it is exercised by Freeport . . . . If at any time . . . the premises are no longer used for . . . this permissive use . . . then this . . . use shall

of the order sets forth the names of the three aldermen who voted "Nay" and of the two absentees.   It was formally filed with the city clerk on May 6, or May 7, 1970.

On June 5, 1970, the city clerk accepted and filed a one-page statement prepared sometime after May 4, 1970, by the city legal department.   This summarizes the actions of the Land Use Committee and of the board, on May 4, 1970, and theretofore.   It recites the substance of the reasons stated by the Land Use Committee's chairman in his oral report to the board on May 4, and that the board approved the request for permissive use, "accepted the reasons of the [c]ommittee as its reasons for ordering such approval, and included in the order all of the restrictions recommended by the . . . [c]ommittee." [8]

Some of the judge's further findings (apart from stating the conditions, fn. 7) may be summarized as follows: The locus is to be used, for periods ranging from three months to a year or more, as a home away from home for high school students experiencing difficulty with life at

_____

. . . cease and the premises may not thereafter be used for any purposes except those permitted as of right in the zoning district . . .. 11. There shall be provided a maximum of . . . [four] parking spaces . . . [which] shall not be blacktopped.   12. There shall be no loud or excessive noises . . . at any time . . . and the playing of radios . . . [and similar instruments] after 11:00 P.M. . . . shall be prohibited. 13. The . . . premises are to be put into a good landscaped condition . . . and the grass, shrubs . . . and hedges shall be cut and trimmed as required . . ..   14. The exterior of the buildings on said premises are to be painted and put into a reasonable state of repair prior to . . . occupancy . . ..   15. The general management . . . of said premises shall be the responsibility of a house committee to be established by . . . [Freeport] with representation . . . to be partly from those neighbors elected to . . . [the] house committee from . . . neighbors living within a radius of 300 feet . . ..   17. This permissive use shall expire not later than six . . . months from the date of [issuing] the . . . occupancy permit and sooner in the event any of the foregoing conditions shall be violated in the discretion of the [b]oard . . . provided however, that . . . [such] permissive use may be renewed upon petition . . . subject to a public hearing, the necessity of which shall be in the discretion of the [b]oard . . .."

[8] The judge made findings in substance as follows: The statement was prepared to supplement the May 4, 1970, decision.   The member of the law department who prepared it had in his possession the typewritten memorandum read to the board on May 4, 1970.   The statement was not prepared pursuant to specific instructions, rules, or policy of the board.   It, however, correctly reflects in substance what the board and its committee did on or before May 4, 1970.

home. The large house is on a lot 21,170 square feet in area. The students will be referred by schools, psychiatrists, social agencies, and churches. House parents, already selected by Freeport, will be an ordained Methodist minister and his wife, both with relevant experience. The proposed use will not substantially diminish the residential character or appearance of the house or grounds, which have been in a somewhat shabby condition. Indeed, Freeport's plans will improve the attractiveness of the property.

After summarizing medical testimony and testimony from school officials, the judge concluded that "the proposed use of the locus, under the carefully-drawn conditions imposed by the [b]oard . . . will be in harmony with the general purpose and intent of the zoning ordinances . . . and especially those . . . relating to single residence districts. . . . [T]he residential character of the locus itself will not be destroyed and . . . the proposed use, properly conducted, will not be detrimental to the neighborhood . . . [nor] affect the residential character of the neighborhood." [9]

The judge made various rulings. We deal with those sufficiently argued by the neighbors to require discussion.

1. The neighbors contend that the board's decision did not meet the requirements of G. L. c. 40A, § 18, as amended (see fn. 4). Although the decision is cast in the form of an order appropriate for a legislative body, the deficiencies of the decision (as the judge found) are "insubstantial . . . and not prejudicial to the" neighbors. The first paragraph of the decision states the board's general conclusions. The unusually detailed conditions (see fn. 7, *supra*) show thoughtful consideration of the objections advanced in opposition to the permit. They show also the board's decision on each of them.

---

[9] The judge found further that the board did not act unreasonably or capriciously, that there was ample basis for its action, and that the board's failure to act within sixty days after the application was filed (see fn. 4) did not adversely affect the neighbors. See *Cullen* v. *Building Inspector of No. Attleborough*, 353 Mass. 671, 680.

This board, and other boards acting in like situations, should prepare decisions with more specific and complete findings and statements of reasons. Some of the deficiencies were met by the statement of conditions. Others were met by the supplemental statement filed June 5, 1970 (see fn. 8, and related text, *supra*). The judge, we think correctly, found "no prejudice" to the neighbors "from this late filing." See *Dion* v. *Board of Appeals of Waltham*, 344 Mass. 547, 552–553. It was done within a reasonable time by or in behalf of the city clerk charged with recording the proceedings of the board. See St. 1897, c. 283, § 9.

The proceedings on May 4, 1970, and earlier, described in the statement, had been attended by representatives of proponents and opponents of the permit. This accurate statement, the written text of the committee chairman's report, the order, and the conditions (fns. 6, 7) in the aggregate show the reasons for the board's decision. See *Zartarian* v. *Minkin*, 357 Mass. 14, 16–18. This is not a case where there was a complete failure to state or disclose reasons. Cf. *Tahanto Associates, Inc.* v. *Board of Appeals of Bourne*, 346 Mass. 762; *Lane* v. *Selectmen of Great Barrington*, 352 Mass. 523, 526–527. Cf. also *MacGibbon* v. *Board of Appeals of Duxbury*, 347 Mass. 690, 692; *S. C.* 356 Mass. 635, 639. With respect to a permit for an exception, the specific requirements for a variance need not be satisfied. See *Moore* v. *Cataldo*, 356 Mass. 325, 328. Cf. *McNeely* v. *Board of Appeal of Boston*, 358 Mass. 94, 100–101.

We agree with the judge that there has been compliance with the substance of the requirements of G. L. c. 40, § 18.[10]

---

[10] Doubtless, the failure to adhere to a conventional administrative form of decision, including findings and conclusions, is because the decision was made by a board of over twenty aldermen (accustomed to action in a legislative manner), rather than by a much smaller administrative board of appeals. A large board obviously must rely on its clerk and upon its or the city's staff in such matters. Confusion and litigation, however, have obviously been caused by the board's failure to follow more usual practices.

2. We perceive no fatal vagueness or uncertainty in the standards laid down by the zoning ordinance (see fns. 2, 3, *supra*). Freeport and its proposed beneficiaries, we think, are clearly an "[a]ssociation of persons living together in a common dwelling." The proposed use of the building may also constitute a "dormitory." In a general sense, Freeport is an "educational" institution attempting to prepare its high school "clients" for life and to assist them to solve their difficulties in adjusting to their parents. The "common and approved" meaning of the words "association of persons" includes, we think, such a small group of students under appropriate supervision. See *Kurz* v. *Board of Appeals of No. Reading*, 341 Mass. 110, 112.

The board and its committee exercised unusual diligence to make certain (a) that the public convenience will be substantially served by granting the permit, and (b) that there will be no detriment to the public good or derogation from the purpose of the ordinance with respect to a single residence district. They and the trial judge obviously found no ambiguity or vagueness in the terms used, nor do we. See for a somewhat similar situation *Salvation Army of Mass. Inc.* v. *Board of Appeal of Boston*, 346 Mass. 492, 493–494. There is no such unlimited grant of arbitrary authority to the board as was held to be invalid in *Clark* v. *Board of Appeals of Newbury*, 348 Mass. 407, 408–409.

3. The permit was not invalid because given to Freeport only for its own use and for only so long as its occupancy was without violation of the reasonably imposed conditions. The validity of a permit, thus limited to a single permit holder, was not finally determined in *Todd* v. *Board of Appeals of Yarmouth*, 337 Mass. 162, 168–169. In that case, however, it is strongly intimated that the "power to give permits . . . is so worded [see G. L. c. 40A, § 4, fn. 4, *supra*] as to suggest that personal use may be contemplated." In *Maki* v. *Yarmouth*, 340 Mass. 207, 213, we stated that a master (following the *Todd* decision), who construed a permit considered in the *Todd*

case as "personal" to the holder, correctly applied that decision.[11]    We have no doubt that the present permit is not only valid but personal to Freeport and properly dependent for its continuance on Freeport's compliance with the conditions (fns. 6, 7, *supra*).[12]

4. Evidence was properly admitted concerning the aspects of Freeport's activities which were educational in character.    Freeport apparently has made some contention (which it has not waived, but which it does not seriously press) that it is an institution organized for public educational purposes.    See G. L. c. 40A, § 2 (as appearing in St. 1957, c. 145; see later amendment by St. 1959, c. 607, § 1).    The extent to which Freeport's project will be such an institution, or will be used "for any educational purpose," was relevant in deciding whether its proposed activities were generally appropriate in this residential district.

The Land Use Committee's oral report to the board on May 4, 1970 (see earlier parts of this opinion), showed what was before the board and one basis on which it acted.    The committee chairman testified that he read this report to the full board verbatim in the presence of at least some of the neighbors and their counsel and that

---

[11] Cases from other jurisdictions, relied on by the neighbors, seem irrelevant to the validity of the conditions and rest on somewhat different statutory provisions.    See *Vlahos Realty Co. Inc.* v. *Little Boar's Head Dist.* 101 N. H. 460 (decision deals with question as relating to a variance and not to an exception under the closest New Hampshire statutory equivalent to G. L. c. 40A, § 4; see N. H. Rev. St. 31:66; 31:72II) ; *Soho Park & Land Co.* v. *Board of Adjustment of Belleville,* 6 Misc. (N. J.) 686 (condition held unreasonable but no discussion of personal condition) ; *Olevson* v. *Zoning Bd. of Review of Narragansett,* 71 R. I. 303, 308 (case rests on inadequate consideration of the *Soho Park & Land Co.* case, *supra*).    In any event, these decisions cannot control the language of § 4 referred to in the *Todd* case.

[12] It is argued by the neighbors that it may be impossible for Freeport to comply with some of the conditions, e.g., no. 15, establishing a house committee with representation from the neighbors.    If the neighbors, given opportunity to obtain a voice in the management of the enterprise, fail to take advantage of that opportunity, they cannot reasonably be heard to use their own lack of coöperation to attack this condition imposed for their benefit.    Such a condition the board might reasonably waive as insubstantial, if it proves impossible of performance.

the board accepted that report. This report is consistent with the written order adopted at the meeting (fns. 6, 7) as supplemented by the statement (fn. 8) of the city clerk filed on June 5, 1970. This statement and the report in substance constituted parts of the "detailed record of . . . [the board's] proceedings" mentioned in G. L. c. 40A, § 18 (see fn. 4, *supra*), and were admissible.

5. The trial judge's conclusions that the public interest of the community gives support to Freeport's project and that it will have no detrimental effect on the locus and upon the neighborhood were fully justified by substantial testimony. There was evidence about the need for the project and its public usefulness. There was also testimony that improvements and changes made on the locus for the purpose of the project would not change the exterior of the house, would not make it unsuitable for a single family residence, and in fact would increase its value and the safety of its occupants. Thus, if the permit should not be renewed, resumption of single family use would not be made more difficult. The judge was not required to believe evidence of real estate experts that market values in the neighborhood would be adversely affected.

*Decree affirmed with costs of appeal.*